**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

SERGIO RAMON MARQUEZ,
        *Defendant-Appellant.*

No. 04-30243

D.C. No.
CR-03-00450-RSL

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, Chief District Judge, Presiding

Argued and Submitted
April 6, 2005—Seattle, Washington

Filed June 7, 2005
Amended July 18, 2005

Before: William C. Canby, Jr., Richard C. Tallman, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Tallman

## COUNSEL

Timothy R. Lohraff, Assistant Federal Public Defender, Seattle, Washington, for the defendant-appellant.

Michael J. Lang, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

## ORDER

The Opinion filed on June 7, 2005, is amended as follows:

On slip opinion page 6512, replace Section II.B.3 with the following text:

Finally, "airport screening searches are valid only if they recognize the right of a person to avoid search by electing not to board the aircraft." *Davis*, 482 F.2d at 910-11; *see also id.* at 913. In this case, Marquez checked in, went to the security checkpoint, waited in line, placed his bag on the x-ray scanner, proceeded through the walkthrough magnetometer, and allowed Petersen to begin screening his person with the hand-

held magnetometer; he had ample opportunity to choose to forego air travel in order to avoid the screening. There is no evidence before us that Marquez ever changed his mind about flying to Anchorage and that issue was neither briefed nor argued by the parties.

## OPINION

TALLMAN, Circuit Judge:

Sergio Ramon Marquez was randomly selected for secondary security screening at Seattle-Tacoma International Airport and found to be in possession of two kilograms of cocaine lodged underneath his pants. He challenges the denial of his motion to suppress the evidence obtained during this administrative airport search. He questions whether an airport screening procedure subjecting passengers to a handheld magnetometer wand scan, in addition to the standard walk-through magnetometer and x-ray luggage scan, is constitutionally reasonable where the passenger is randomly selected for more intrusive screening upon or before entering the Transportation Security Administration ("TSA") security checkpoint. We hold that this random, additional screening procedure is reasonable under the Fourth Amendment. Accordingly, we affirm the district court's denial of Marquez's motion to suppress.

## I

On the afternoon of October 3, 2002, Marquez attempted to board a domestic flight to Anchorage from Seattle. After checking in for his flight, he proceeded to the TSA security checkpoint where he was diverted to Checkpoint B, the "selectee lane." A passenger chosen for the selectee lane is subjected to more thorough search procedures, regardless of whether or not the x-ray luggage scan reveals something

suspicious or the walkthrough magnetometer sounds an alarm. The primary additional procedure involves a full-body wanding with a handheld magnetometer that uses technology similar to, but more sensitive than, the walkthrough magnetometer. According to testimony, a passenger is randomly selected for the selectee lane either by the airlines at the time of check-in or by TSA employees stationed at the security checkpoint entrance when the passenger presents his or her identification and boarding pass.[1] It is not clear whether Marquez was selected by his airline or by the TSA employee who checked his identification and boarding pass before he entered the security line. For purposes of the constitutional analysis it is immaterial because there was no showing that the decision was supported by any articulable reason other than completely random selection.

Once in line, Marquez took off his coat and shoes and placed them on the x-ray scanner conveyor belt along with his carry-on luggage. He walked through the magnetometer[2] and was instructed to sit down in the screening area. At this point, TSA screener Petersen, who was in charge of wanding the passengers in the selectee lane when Marquez passed through, retrieved Marquez's personal items from the x-ray belt. Petersen then approached Marquez and began to scan his person with the handheld magnetometer, screening Marquez's feet first, then having him stand up to screen the rest of his body.

Thus far, the wand had not indicated the presence of anything suspicious. However, the wand "alarmed" when it passed over Marquez's right hip. Petersen testified that he

---

[1]The district court properly determined that testimony regarding TSA policy was sufficient to establish random selection and that it was unnecessary to perform *in camera* review of the TSA policy in question.

[2]The record is unclear whether Marquez set off any alarm when he walked through the magnetometer. He would have been subjected to the handheld magnetometer scan either way, and the district court assumed, for purposes of deciding the motion to suppress, that Marquez did not set off an alarm.

understood TSA policy to require him to determine the cause of the alarm. Thus, Petersen informed Marquez that he had to touch Marquez's hip in order to ascertain what had triggered the alarm. Marquez denied Petersen permission to touch his hip, and swatted Petersen's hand away when he tried to touch the area. Nonetheless, Petersen felt a "hard brick type of thing" and, on the basis of his experiences in the military and his TSA training, Petersen feared that the object might be C-4 explosives.

After swatting Petersen's hand away, Marquez continued to protest Petersen's subsequent attempts to determine the source of the alarm, telling Petersen that the wand must have been triggered by a metal rivet on his pants, and that there was no need to look any further. Petersen persisted as well, telling Marquez that he needed to determine what set off the wand, and Marquez continued to refuse, repeating that it was "[just] a rivet."

Petersen called for his supervisor. Marquez was becoming increasingly agitated, and, upon arrival, the supervisor recommended that he "[c]alm down a little bit" because they had "to get through this if [Marquez] wanted to fly." Both Petersen and his supervisor again attempted to obtain Marquez's permission to continue with the wanding and determine the source of the alarm, but Marquez refused. Ultimately, after entering a private screening room and in response to the supervisor's repeated requests to determine what caused the wand to alarm, Marquez quickly pulled down his pants, revealing "bricks of stuff in his crotch area . . . with a pair of [spandex leggings] over the top." Port of Seattle Police were summoned, and an agent from the Drug Enforcement Agency ("DEA") also responded. The officers searched and questioned Marquez and then retrieved four wrapped bricks of cocaine from his person.

Marquez was charged with one count of possession with intent to distribute over 500 grams of cocaine, in violation of

21 U.S.C. § 841(a)(1). Marquez moved to suppress the evidence, arguing that the additional screening procedures were unreasonable because they were not based on individualized suspicion of wrongdoing. The district court denied the motion to suppress, concluding that the additional screening in the selectee lane was reasonable. Marquez entered into a conditional plea agreement with the Government and was sentenced to 60 months in prison. This appeal followed.

## II

Motions to suppress are reviewed *de novo*. *See United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). However, the trial court's factual findings are reviewed for clear error. *See United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

This case presents a legally novel, yet practically ubiquitous, set of facts. The issue here is whether the random selection of Marquez to go to the selectee lane, where he would automatically be subjected to the wanding of his person with the handheld magnetometer in addition to the walkthrough magnetometer and the x-ray luggage scan, was reasonable. We conclude that it was.

## A

[1] Airport screenings of passengers and their baggage constitute administrative searches and are subject to the limitations of the Fourth Amendment. *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973) (noting that airport screenings are considered to be administrative searches because they are "conducted as part of a general regulatory scheme" where the essential administrative purpose is "to prevent the carrying of weapons or explosives aboard aircraft"); *see also id.* at 895, 904. Thus, airport screenings must be reasonable. *See Torbet v. United Airlines, Inc.*, 298 F.3d 1087, 1089 (9th Cir. 2002). To judge reasonableness, it is necessary to balance the right

to be free of intrusion with "society's interest in safe air travel." *United States v. Pulido-Baquerizo*, 800 F.2d 899, 901 (9th Cir. 1986).

**B**

**[2]** In *Davis* and its progeny, we have established a general reasonableness test for airport screenings. "An airport screening search is reasonable if: (1) it is no more extensive or intensive than necessary, in light of current technology, to detect weapons or explosives; (2) it is confined in good faith to that purpose; and (3) passengers may avoid the search by electing not to fly." *Torbet*, 298 F.3d at 1089 (citation omitted); *see also Davis*, 482 F.2d at 913; *Pulido-Baquerizo*, 800 F.2d at 901.

**1**

**[3]** "Little can be done to balk the malefactor after [weapons or explosives are] successfully smuggled aboard, and as yet there is no foolproof method of confining the search to the few who are potential hijackers." *Davis*, 482 F.2d at 910. Thus, airport screenings of passengers and their carry-on luggage in order to detect weapons and explosives and deter potential passengers from carrying such items aboard is "reasonably necessary" and not overly intrusive in light of the interests at stake. *Id.*; *see also Chandler v. Miller*, 520 U.S. 305, 323 (1997) (suggesting that, "where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable' "). It is also necessary to provide for screening procedures designed to detect non-metallic threats to air safety. *See* WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 10.6(d) (4th ed. 2005). The intensity and extent of screening must take into account the fact that "[h]ijackers as well as airport officers know of the existence of plastic explosives or even ordinary dynamite." *United States v. Albarado*, 495 F.2d 799, 809 (2d Cir. 1974); *see also Pulido-*

*Baquerizo*, 800 F.2d at 901 (noting that weapons and explosives can be "small and easily concealed" and that "[t]heir detection is difficult").

We have previously found airport screenings which require passengers to walk through a magnetometer and submit carry-on luggage for x-ray screening to be reasonable. *See, e.g.*, *United States v. Doran*, 482 F.2d 929, 932 (9th Cir. 1973); *Pulido-Baquerizo*, 800 F.2d at 901-02; *Torbet*, 298 F.3d at 1089-90. Generally, such a search "is brief, is less intrusive than the typical search warrant execution, does not have a stigma attached to it, is not made by armed police, and is often made only with advance notice." LAFAVE, *supra*, § 10.6(c).

[4] The added random screening procedure at issue in this case involving a handheld magnetometer scan of Marquez's person was no more extensive or intensive than necessary in order to detect weapons and explosives. It utilized the same technology and reported results based on the same type of information (*e.g.*, the presence or absence of metal) as the walkthrough magnetometer. *See United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1245 (9th Cir. 1989) (noting that, unlike this case, "the court cannot sustain a subsequent search that differs in material respects from the search initially approved"). While it arguably constituted a "slight privacy intrusion," *Pulido-Baquerizo*, 800 F.2d at 902, it was reasonably confined to procedures necessary to detect weapons and explosives, including those that may evade detection by the larger, less sensitive walkthrough magnetometer.

## 2

Airport screening procedures are conducted for two primary reasons: first, to prevent passengers from carrying weapons or explosives onto the aircraft; and second, to deter passengers from even attempting to do so. *See Davis*, 482 F.2d at 908.

In their briefs and at oral argument, neither party suggested that there was any purpose or goal in the instant search other than to detect weapons or explosives. TSA screener Petersen stated that he was trained to look for "anything that would bring a plane down" and that the search of Marquez was in accordance with this goal. He further testified repeatedly that he was not trained, nor told, to search for anything other than weapons or explosives, and he said explicitly that he was not trained to look for drugs: "Our job is to make the passengers in the airplanes safe, and we don't look for drugs." Moreover, nothing in the record indicates that he was looking for drugs or criminal evidence; rather, the record supports his assertion that he was trying to "ferret out firearms and explosive devices[.]" *Pulido-Baquerizo*, 800 F.2d at 902; *see also $124,570 U.S. Currency*, 873 F.2d at 1243 (noting that airport searches conducted as part of a general regulatory scheme rather than an attempt to secure evidence of a crime are valid).

Additionally, the randomness of the selection for the additional screening procedure arguably increases the deterrent effects of airport screening procedures because potential passengers may be influenced by their knowledge that they may be subject to random, more thorough screening procedures.

**[5]** The mere fact that a screening procedure ultimately reveals contraband other than weapons or explosives does not render it unreasonable, *post facto*. "Of course, routine airport screening searches will lead to discovery of contraband and apprehension of law violators. This practical consequence does not alter the essentially administrative nature of the screening process, however, or render the searches unconstitutional." *Davis*, 482 F.2d at 908. The screening at issue here is not unreasonable simply because it revealed that Marquez was carrying cocaine rather than C-4 explosives.

### 3

**[6]** Finally, "airport screening searches are valid only if they recognize the right of a person to avoid search by elect-

ing not to board the aircraft." *Davis*, 482 F.2d at 910-11; *see also id.* at 913. In this case, Marquez checked in, went to the security checkpoint, waited in line, placed his bag on the x-ray scanner, proceeded through the walkthrough magnetometer, and allowed Petersen to begin screening his person with the handheld magnetometer; he had ample opportunity to choose to forego air travel in order to avoid the screening. There is no evidence before us that Marquez ever changed his mind about flying to Anchorage and that issue was neither briefed nor argued by the parties.

## III

It is hard to overestimate the need to search air travelers for weapons and explosives before they are allowed to board the aircraft. As illustrated over the last three decades, the potential damage and destruction from air terrorism is horrifically enormous. *See, e.g.*, *Davis*, 482 F.2d at 910; *Pulido-Baquerizo*, 800 F.2d at 901. However, even with the grave threat posed by airborne terrorist attacks, the vital and hallowed strictures of the Fourth Amendment still apply: these searches must be reasonable to comport with the Constitution.

[7] The random, additional screening procedure in this case satisfies the *Davis* reasonableness test for airport searches. The procedure is geared towards detection and deterrence of airborne terrorism, and its very randomness furthers these goals. This was a limited search, confined in its intrusiveness (both in duration and scope) and in its attempt to discover weapons and explosives.[3] Given the randomness, the limited nature of the intrusion, the myriad devices that can be used to bring planes down, and the absence of any indicia of improper motive, we hold that the random, more thorough screening involving scanning of Marquez's person with the handheld magnetometer was reasonable. The district court properly

---

[3]This would, perhaps, be a different case if there were improper motives established by the record below or argued in the briefs.

denied Marquez's motion to suppress the contraband found during TSA screening.

**AFFIRMED.**