**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

v.

SIMON JASPER MCCARTY,
  *Defendant-Appellee.*

No. 09-10504

D.C. No.
1:08-cr-00513-
JMS-1

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted
October 14, 2010—Honolulu, Hawaii

Filed August 3, 2011
Amended September 9, 2011

Before: Michael Daly Hawkins, M. Margaret McKeown and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Hawkins

17103

## COUNSEL

Vijay Shanker (argued) and David E. Hollar (briefed), United States Department of Justice, Washington, D.C., for the plaintiff-appellant.

William A. Harrison (argued and briefed), Davies Pacific Center, Honolulu, Hawaii, for the defendant-appellee.

## ORDER

The government's Motion to Amend footnote 6 in the Opinion that is cited at 2011 WL 3319428 (9th Cir. August 3, 2011) is granted, but only for the limited purpose of amending the third sentence of footnote 6 to read: "On appeal, the government did not contend this search of the second bag was a lawful administrative search or contest suppression of any evidence found therein on a basis independent of its main argument."

No subsequent petitions for rehearing or rehearing en banc will be accepted for filing.

## OPINION

HAWKINS, Senior Circuit Judge:

The competing interests of personal privacy and the safety of the traveling public are at the heart of this interlocutory government appeal from the district court's suppression of all evidence obtained as a result of an airport search of defendant Simon McCarty's ("McCarty") checked luggage at Hilo International Airport. The government argues the evidence from McCarty's bag—which included, among other things, almost five dozen photographs of nude and partially nude minors,[1] children's underwear and pajama advertisements, and handwritten notes describing the molestation of children—was discovered during the course of a properly limited administrative search, the search was therefore lawful, and McCarty's subsequent warrantless arrest was supported by probable cause. McCarty contends, and the district court agreed, that Transportation Security Administration ("TSA") agents turned a routine administrative search for explosives into an unauthorized investigatory search for contraband. We have jurisdiction pursuant to 18 U.S.C. § 3731 and, for the following reasons, vacate the suppression order and remand to the district court for further proceedings.

### STANDARD OF REVIEW

"A district court's conclusions of law regarding a motion to suppress are reviewed de novo." *United States v. Hammett*, 236 F.3d 1054, 1057 (9th Cir. 2001). Its factual findings are reviewed for clear error. *United States v. Aukai*, 497 F.3d 955, 958 (9th Cir. 2007) (en banc). A finding of clear error requires "a definite and firm conviction that a mistake has

---

[1]Of the fifty-eight photographs discovered, fifty-seven were of minor children in various states of undress. Eleven of the photographs depicted fully nude children with exposed or partially covered genitals. *United States v. McCarty*, 672 F. Supp. 2d 1085, 1092-1093 (D. Haw. 2009).

been made. Thus, if the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently." *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002) (internal citations and quotation marks omitted).

## FACTS & PROCEEDINGS BELOW

### A. Facts

#### 1. Preliminary Facts

McCarty, a United Kingdom national, traveled to Hilo International Airport to board an intrastate flight bound for Honolulu on August 5, 2008. He checked two pieces of luggage for the flight: (1) a "Travel Pro" brand bag; and (2) a "Travel Zone" brand bag. The two bags were sent, as is customary for all checked passenger baggage, to the TSA screening area, where TSA screeners Dorinda Andrade ("Andrade") and Jenny Moniz ("Moniz") (who happens to be Andrade's daughter), were screening luggage for explosives using a CTX 5500 DS security x-ray machine ("CTX machine" or "CTX"). The Travel Zone bag passed through the machine without incident, but the CTX machine produced an alarm on the Travel Pro bag, signaling to Andrade that there was a dense item in the bag requiring further inspection. The inspection that followed is the subject of this appeal.

#### 2. CTX Machines and TSA Screening Policies

TSA screens all luggage that goes onto a plane to ensure it does not contain any explosive devices or other items that would threaten the safety of the plane. One method of screening is through an x-ray device such as the CTX machine used here, which can identify potential safety risks or dense items in luggage that require further inspection. CTX machines automatically stop the procession of bags through the screen-

ing area when they "alarm"[2] on a potential safety hazard in a bag; TSA screeners do not have the discretion or ability to stop the machines themselves. Patrick Collins ("Collins"), the Deputy Assistant Federal Security Director for TSA in charge of operations at three Maui County airports, testified regarding TSA procedures for searching checked luggage after the CTX machine alerts on a particular bag. According to Collins, when this occurs, the TSA screener is required to find and examine the item identified by the machine to ensure it is not an explosive device. For example, if the item is a laptop computer, the screener must physically remove the laptop from the luggage and examine it for the presence of hidden explosives. A laptop may be used as a "decoy" or "distracter," meant to distract the screener from continuing to search the bag for explosives.

Additionally, thin, flat explosives called "sheet explosives" may be disguised as a simple piece of paper or cardboard, and may be hidden in just about anything, including a laptop, book, magazine, deck of cards, or packet of photographs. Collins explained that where the CTX alarms on a dense mass and the screener opens the bag to find a packet of photographs, the screener is required to leaf or thumb through the stack of photographs until she is sure there are no sheet explosives. She would not be required to closely examine those items (by, for example, reading the contents of a written document) unless she determined that they were "distracters."

Under TSA protocol, the search does not conclude until the screener has cleared the bag of all safety concerns identified by the CTX machine. According to Collins, "[t]he officer has to be satisfied that there's nothing else in that bag that could have caused that alarm. And they take whatever procedure

---

[2]TSA personnel used the word "alarm" as a verb throughout their testimony, indicating that the CTX machine flagged the bag for further inspection. We adopt their usage of the word for the purposes of this Opinion, and use it interchangeably with "alert."

they have to to find that." In some cases, this may require going as far as removing the lining of the bag to ensure that no possible explosives remain. Adherence to the protocol is mandatory, not discretionary, although the determination of whether any further safety concerns exist after a preliminary search is committed to the discretion of the screener. The screener is to end the search once she is satisfied that she has followed the protocol and removed all safety concerns.

TSA screeners do not have any training in identifying contraband, and they are not directed by any policy to perform searches for contraband. The screener's sole job is to clear bags of safety concerns relating to air travel. However, if, in the course of searching for explosives, a screener finds an item she believes to be contraband, she is required by TSA Operations Directive OD-400-54-2 to call a law enforcement officer.[3] It is not the screener's job to continue investigation of possible contraband found in the course of an administrative safety inspection.

### 3. The Search

The CTX alerted on McCarty's Travel Pro bag at 10:13 a.m., flagging as a possible safety concern what appeared to be a laptop with a dark mass around it.[4] Andrade could not tell what the dark mass was by looking at the CTX image, so she released the bag from the machine and placed it on a search table for manual inspection.

Based on the weight of the bag, Andrade determined that

---

[3]The item need not actually be contraband; Collins testified that screeners are required under the TSA policy to notify a law enforcement officer and turn the item over for further action if they simply "feel it possibly could be contraband." McCarty does not challenge the TSA policy on this matter.

[4]When a CTX alerts, it identifies possible safety threats by placing a red box on the screen, framing the possible problem item.

the laptop was in the top pocket. She unzipped the pocket halfway and pulled out the laptop with one hand. As she did so, another bag passed through the CTX machine, and Andrade turned her head to watch the machine's screen while that bag passed through. When she turned back to the table, she noticed that an envelope had also slid out of the bag with the laptop, spilling some of the envelope's contents. Andrade testified that "a couple of pictures" were "laid open on the table," although she clarified that by "a couple" she meant that more than ten photographs were visible. The precise arrangement of the photographs on the table is unclear.

Andrade took approximately one minute to clear the laptop pursuant to TSA protocol before turning to the photographs and other spilled items. She noted that, after searching the laptop, she needed to find the dark mass shown in the CTX image, which she believed could be the photographs on the table. Andrade could not "precisely say what photographs" were immediately visible when they first spilled out, but she did remember seeing photos of nude children, including one of a boy on a bed with his eyes closed.[5] She inspected the photographs that had spilled out of the envelope onto the table. She then proceeded to look through less than half of the photographs from the envelope, specifically because she needed to clear the contents of the envelope of any safety hazards that might be hidden between the photos. She stopped short of looking through every photograph in the envelope once she was satisfied there were no safety issues, and because she did not want to see any more of the photographs. Then, although she was no longer concerned about explosives and felt that the "pictures that [she] saw [were] enough to make [her] determine that the children weren't in a good situation," Andrade proceeded to read a few lines of the letters in the envelope to "determine what the pictures were all about" and to "make sure" that the photographs were contraband

---

[5]It was unclear whether Andrade saw this photograph initially or whether she saw it later on in the course of her search.

before she called her lead officer to report them. She also viewed the advertisements and two newspaper article clippings discussing minors engaging in sexual activity with adults and other minors.

At some point during this inspection, Andrade said out loud, "what the heck is this?" Moniz, who was also present in the room, came over to see what caused Andrade's reaction. She helped Andrade pick up the contents of the envelope, and her initial impression upon seeing the visible photos was that there was something "wrong." Moniz testified that while the two were collecting the photos that spilled out of the envelope, "at that point we saw something that was improper, we did look through the rest of them, and then we stopped." During this process, she saw newspaper articles, some children's underwear advertisements, and a letter. Moniz read a few lines of the letter and showed Andrade the underwear ads. Moniz specifically testified to seeing photographs of a nude boy in a pond setting and another of a boy laying on a bed with his eyes "squinted shut to hold it shut like he was very uncomfortable," but she could not recall whether these photographs were among the first she saw before she and Andrade looked through the contents of the envelope. Although Moniz recalled seeing "a lot" of images that looked "improper" to her, she could not identify exactly which of the fifty-eight photographs she saw.[6]

Tracy Kitamura ("Kitamura"), the lead on-site TSA screener, was already in the room when Andrade and Moniz

---

[6]At the direction of the TSA supervisor, Moniz also performed a full search for explosives on McCarty's other bag, which had already cleared the TSA safety inspection and which had not produced any alarm upon passing through the CTX machine. During the course of that search, Moniz flipped through the pages of a journal in the second bag, and read one page that caught her attention. On appeal, the government did not contend this search of the second bag was a lawful administrative search or contest suppression of any evidence found therein on a basis independent of its main argument.

were looking through the contents of the envelope. Andrade called him over, although it is somewhat unclear whether she did so before or after she and Moniz proceeded to look through the non-photographic items in the envelope, and whether Kitamura was already heading over to the table after hearing Andrade's exclamation. Kitamura briefly leafed through the photographs that were on the table and immediately felt sick to his stomach because "[t]he photos were very disturbing initially." He did not read the letters. The first photos he saw were of nude children, and he also saw photos of partially clad children. He then immediately called in the Hilo TSA Supervisor, Stephanie Kamohai ("Kamohai"). Kamohai shuffled through the contents of the envelope, including the photographs and newspaper clippings, without reading or closely examining them. She read three or four lines of the letter. Within fifteen seconds of viewing the items, Kamohai decided to call a law enforcement officer based solely on the photographs she had seen.

Just before 10:20 a.m., less than seven minutes after the CTX alarmed on McCarty's bag, Kamohai called Rodney Aurello ("Aurello"), a private security contractor working with the Hawaii Department of Transportation, who was assigned to Hilo airport. Aurello thumbed through the photographs. He testified that, based on his background working in the "juvenile age section," he "thought it was kind of suspicious that [McCarty] would have all of these photographs, especially of the nude minors," and immediately decided to call his supervisor to suggest calling the police.

Two Hawaii County Police Department officers, including Detective Norbert Serrao ("Serrao"), responded less than twenty minutes later. Serrao spent two to three minutes examining the photographs, but did not read all the articles or the letters. Based on what he saw, Serrao decided to arrest McCarty for promotion of child abuse in violation of Hawaii Revised Statutes § 707-752.

After McCarty's arrest, Detective John Ancheta ("Ancheta") interviewed him at the Hilo Police Department. Ancheta explained that, based on his discussions with other officers, he believed he had enough evidence to arrest McCarty for possession of child pornography. He then asked McCarty for consent to search his luggage. Ancheta explained McCarty's options, including the right to refuse consent to the search. McCarty initialed and signed a consent form for the search. Ancheta also read McCarty his *Miranda* rights, which McCarty waived by initialing a fully completed Advice of Rights form stating that he understood the rights he was read, that he did not want a lawyer, and that he would like to speak with Detective Ancheta about what had happened. After waiving these rights, McCarty was interviewed and admitted to having unnatural feelings about children for some time, but denied ever acting on those feelings.

McCarty was arrested two days later on a federal complaint. Federal agents obtained a search warrant for McCarty's laptop computer, on which they discovered hundreds of images and at least 200 video clips of child pornography. Sixty of these video clips depicted McCarty engaged in sexual activity with at least three different prepubescent boys.

## B.   Procedural History

A grand jury returned a 10-count second superseding indictment against McCarty on January 21, 2009. The indictment alleged: two counts of transportation of child pornography in violation of 18 U.S.C. § 2252A(a)(1); two counts of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B); and six counts relating to coercing minors to engage in sexually explicit conduct outside the United States for the purpose of producing a visual depiction of that conduct, and transporting those visual depictions to the United States, in violation of 18 U.S.C. § 2251(c)(1)(B). McCarty filed a motion to suppress all evidence obtained as a result of the airport search of his checked luggage.

After briefing and a suppression hearing, the district court granted McCarty's motion and ordered all evidence seized as a result of the airport search of his luggage suppressed. *McCarty*, 672 F. Supp. 2d at 1090. The court ultimately found that "Andrade's search of the Travel Pro bag went beyond the scope of an airport administrative search for weapons and/or explosives and that her vague and contradictory testimony regarding what items she found during her administrative search are insufficient to support probable cause [to arrest McCarty]." *Id.* at 1095.[7] Concluding McCarty had therefore been arrested without probable cause, the district court determined that any evidence obtained during the subsequent consent and warrant-based searches was fruit of the poisonous tree. *Id.* at 1103-04.

In reaching these conclusions, the district court described the sequence of events, noting with particular frustration that Andrade's testimony was confusing and contradictory at several points,[8] including as to the exact chronology of events,

[7]The parties agreed that McCarty's arrest would have been valid only if the administrative search produced probable cause to believe he had violated Haw. Rev. Stat. § 707-752. *McCarty*, 672 F. Supp. 2d at 1095.

[8]Andrade's testimony as to her perceptions and impressions of the photographs and other items certainly was confusing and somewhat contradictory, evidencing that Andrade did not subjectively think she had enough evidence of contraband to call law enforcement until she had seen more than just the first few photographs. She testified that she did not know something was wrong when she saw just the first nude photographs, District Court Docket ("DCD") #57 at 63, but after seeing the initial photographs that spilled out of the bag, "the pictures that [she] saw [were] enough to make [her] determine that the children weren't in a good situation," *id.* at 62. She "felt some concern" immediately after seeing nude photographs, *id.* at 70, and "felt that the children were in a harmful way" after leafing through the photos in the envelope, but she read through some of the letters because she "felt that [she] needed to see more than what [she] saw before [she] called [her] lead," *id.* at 62. She also said that she was alarmed "as soon as [she and Moniz] saw the pictures," and that is why she called Kitamura, *id.* at 75, yet she finally decided that there was something wrong only after taking "everything combined together," including the non-photographic items from the envelope. *Id.* at 76-77.

which photographs she had seen, and whether she or Moniz touched any of the items that had spilled onto the table before the lead officer was called. *Id.* at 1092-95. The court stated that it could not discern exactly what Andrade and Moniz inspected, or when they inspected it. *Id.* at 1093.

Acknowledging that TSA screeners could legally search the bag for evidence of explosives, and that Andrade had begun her search with this permissible search intent in mind, the district court began its legal analysis by noting that "Andrade's inadvertent discovery of some of the photographs did not of itself extend the search beyond its valid purpose." *Id.* at 1096 (citing *United States v. Marquez*, 410 F.3d 612, 617 (9th Cir. 2005) ("The mere fact that a screening procedure ultimately reveals contraband other than weapons or explosives does not render it unreasonable, *post facto*.")). Nonetheless, it then stated,

> [t]he court cannot conclude . . . that the search of the Travel Pro bag was limited to ensuring that it did not pose a safety risk. Rather, the testimony evidences that the TSA employees, at some point, clearly exceeded the scope of their administrative search and began to search for evidence of child pornography.

*Id.* Accordingly, the district court found that the government had not carried its burden of proving that the search had been "confined in good faith" to the purpose of detecting explosives. *See id.* at 1096-99 (citing *Aukai*, 497 F.3d at 962).

The district court explained that, "based on [Andrade's] demeanor and testimony provided, the court easily concludes that she was not credible." *Id.* at 1096. It clarified that it was not suggesting that Andrade had perjured herself, but merely that she could not clearly recall what had happened with sufficient clarity. *Id.* at 1096 n.7. The court based its credibility determination on inconsistencies in Andrade's testimony,

placing emphasis on Andrade's statements that her focus was solely on the safety of the children when she read the content of articles and letters from the envelope. *Id.* at 1096-97.

Based on these statements, its assessment of Andrade's credibility, and testimony of other witnesses, the court "specifically [found] that Andrade searched the photographs in the envelope not for sheet explosives but for evidence of child pornography." *Id.* at 1097 n.8; *see also id.* at 1098 n.9 (finding that TSA screeners did not leaf through photographs for evidence of sheet explosives, "but instead inspected them for their content").

Having so found, the district court stated that even if Andrade had continued her inspection for the dual purposes of detecting explosives and determining whether the photos were contraband—which it did not believe was the case—the secondary purpose unrelated to administrative safety concerns would have invalidated the otherwise permissible search because the TSA screeners "had discretion in deciding how closely to look at the photographs and indeed, rather than 'leaf' through them for sheet explosives, inspected them solely to determine whether the children were in harm's way." *Id.* at 1097-98 (citing *United States v. Bulacan*, 156 F.3d 963, 969 (9th Cir. 1998), for the proposition that an impermissible search motive invalidates an otherwise lawful administrative search). However, the court ultimately clarified that it did not believe the extended search was one of dual purpose, but rather one where the administrative search was wholly superseded by the investigative search for evidence of child pornography. *Id.* at 1098 n.9.

The court then specifically rejected the government's argument that the search conducted was proper regardless of motive because Andrade was required by the TSA protocol to leaf or thumb through the photographs to search for sheet explosives, reiterating its finding that Andrade and Moniz "in-

spected the *content* of additional photographs for the purpose of determining their criminal nature." *Id.* at 1098.

Turning to the question of probable cause for the warrantless arrest, the district court found that because Andrade's testimony had not clarified exactly which photos she had seen while she was still searching for explosives, the government failed to prove that Andrade had discovered evidence supporting probable cause to arrest McCarty during the lawful portion of the search. *Id.* at 1099-1102. In so finding, the court emphasized that at least three of the fifty-seven photographs of children were clearly not child pornography, and since neither Andrade nor Moniz could identify exactly which of the photographs she saw when the envelope first spilled onto the table[9] (which the court had apparently concluded was the end point for the lawful administrative search), it could not determine that either screener had seen any photos giving rise to probable cause during the lawful administrative search. *Id.* at 1100-02.[10] Specifically, the court held that

> without knowing which photographs of nude children Andrade saw, the probable cause determination cannot be supported unless all of these photographs constitute child pornography—if only some of the photographs of nude children are child pornography, the court has no way of knowing whether Andrade initially saw those photographs as opposed to the photographs that are not child pornography.

*Id.* at 1100.

---

[9]The court stated, "even if the court credits Andrade's testimony that she initially saw photographs of nude children (which the court does not)," such testimony could not, on its own, establish probable cause. *Id.* at 1100.

[10]The court did not, however, make any determination as to whether any of the remaining photographs constituted child pornography or could have provided probable cause to believe they were child pornography.

The court also held that the lack of specificity in Andrade's testimony meant that the government could not establish the "immediately apparent" incriminating nature of the photographs, and thus the plain view doctrine could not apply. *Id.* at 1098-99. It then found that the exception for good faith mistakes outlined in *Herring v. United States*, 555 U.S. 135 (2009), did not apply to bar suppression in this case. *McCarty*, 672 F. Supp. 2d at 1102-03.[11]

Lastly, the district court held that, assuming McCarty's consent to search of his luggage at the police station was voluntary, the government could not prove the consent was purged of the primary taint of the original unlawful search, and suppression could not be avoided. *See id.* at 1103-04.[12]

The government appealed.

## DISCUSSION

### A.   Scope of the Lawful Administrative Search

[1] The Fourth Amendment protects against unreasonable searches and seizures of people and their effects. U.S. Const. amend. IV. Searches and seizures are " 'ordinarily unreasonable in the absence of individualized suspicion of wrongdoing,' " *Aukai*, 497 F.3d at 958 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)), and the circumstances under which a warrantless search not supported by probable cause may be considered reasonable under the Fourth Amendment are very limited, *see id.*; *United States v. Caseres*, 533 F.3d 1064, 1070 (9th Cir. 2008) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

---

[11]The government did not challenge the district court's ruling on the *Herring* exception on appeal, so we do not review it here.

[12]The government also did not dispute this ruling, so the issue of the effect of McCarty's consent to search at the police station is likewise not before us.

**[2]** Blanket suspicionless searches "calibrated to [a] risk may rank as 'reasonable.' " *Aukai*, 497 F.3d at 958 (internal quotation marks omitted) (quoting *Chandler v. Miller*, 520 U.S. 305, 323 (1997)). For example, if properly limited, "searches now routine at airports and at entrances to courts," are reasonable because they respond to a " 'risk to public safety [that] is substantial and real.' " *Id.* (quoting *Chandler*, 520 U.S. at 323). Generally, "airport screening searches . . . are constitutionally reasonable administrative searches because they are 'conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings.' " *Id.* at 960 (quoting *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973)).[13]

**[3]** Here, the parties agree that, under federal law, TSA agents could legally search McCarty's entire bag for explosives or other safety hazards. *See* 49 U.S.C. § 44901; *cf.* 49 C.F.R. § 1540.111(c) (prohibiting passengers from placing unauthorized explosives, firearms, and incendiary devices in their checked baggage). However, because warrantless, suspicionless administrative searches remain subject to the Fourth Amendment, a *particular* search is "constitutionally reasonable [only where] it 'is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives [and where] it is confined in good faith to that purpose.' " *Aukai*, 497 F.3d at 962 (quoting *Davis*, 482 F.2d at 913).

**[4]** In other words, an airport search remains a valid administrative search only so long as the scope of the administrative search exception is not exceeded; "once a search is conducted for a criminal investigatory purpose, it can no lon-

---

[13]*Aukai* cautions that "[t]he Supreme Court has not specifically *held* that airport screening searches are constitutionally reasonable administrative searches," but rather has *suggested* that they qualify as such. 497 F.3d at 959 n.2 (collecting cases).

ger be justified under an administrative search rationale." *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1246 n.5 (9th Cir. 1989). Thus, because TSA screeners are limited to the single administrative goal of searching for possible safety threats related to explosives, the constitutional bounds of an airport administrative search require that the individual screener's actions be no more intrusive than necessary to determine the existence or absence of explosives that could result in harm to the passengers and aircraft. *See id.* at 1245.[14]

### 1. Import of Search Intent

On appeal, McCarty contends the district court was correct in finding that Andrade developed a subjective "impermissible motive" to search for contraband that extended the warrantless search beyond the constitutional bounds of the valid administrative search, essentially transforming what began as a lawful administrative search into an independent investigation for evidence of child pornography. As such, McCarty argues that Andrade's subjective motivation was the invalidating factor that caused her actions to exceed the scope of the lawful administrative search. The government counters that where the overarching search scheme involves only a single, constitutionally-valid programmatic motive, the subjective intentions of the individual agent acting without broad discretion in carrying out the search are wholly irrelevant. Accordingly, the government argues, because the TSA agents

---

[14]Of course, longstanding precedent allows a screener to call law enforcement if she inadvertently discovers a possibly contraband item in the course of performing her safety check, so long as the scope of the search remains properly cabined to the extent of the lawful administrative search. *$124,570 U.S. Currency*, 873 F.2d at 1249 n.7. We have "refuse[d] to impose an unworkable and unreasonable constraint" on government agents engaged in good faith administrative searches "by requiring that they avert their eyes from obvious unlawfulness." *United States v. Seljan*, 547 F.3d 993, 1005 (9th Cir. 2008) (en banc) (treating customs official searches).

here *could* have viewed any item in McCarty's bag while screening for explosives as part of their administrative search and there was no additional *programmatic* motive, any subtle shifts in the individual minds of the TSA screeners had "no constitutional significance," the search was not extended beyond its permissible scope, and all of the items viewed during the search should have been admitted.

In the mine run of Fourth Amendment cases where at least some quantum of suspicion is involved, the reasonableness inquiry we conduct is largely an objective one, and the subjective motivations of the individual officer involved are irrelevant in determining whether the circumstances objectively justified the action taken or the intrusion occasioned. *See Ashcroft v. Al-Kidd*, 563 U.S. ___, 131 S. Ct. 2074, 2080 (2011). There are "[t]wo 'limited exception[s]' to this rule [for] special-needs and administrative-search cases, where 'actual motivations' do matter." *Id.* (quoting *United States v. Knights*, 534 U.S. 112, 122 (2001)). In these cases, the special or administrative need typically dispenses with the Fourth Amendment requirement of a warrant or probable cause for the search. *Id.* at 2081.

However, the exemption from the warrant and probable cause requirements in these types of warrantless, suspicionless searches "do[es] not apply where the officer's purpose is not to attend to the special needs or to the investigation for which the administrative inspection is justified." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 811-12 (1996)).

**[5]** Thus, some inquiry into the actual motivations behind an administrative search is permitted to guard against wholly pretextual intrusions into the public's reasonable expectations of privacy. *See Edmond*, 531 U.S. at 46-47; *United States v. Hellman*, 556 F.2d 442, 444 (9th Cir. 1977) (inventory of defendant's car was not validated by administrative search rationale where department had no standard policy of inventorying impounded cars, it was clear that the search was actu-

ally conducted for "an investigatory police motive," and officer testified that he instigated the impound specifically to "justify an investigatory search"); *see also Bulacan*, 156 F.3d at 967 (because an "administrative search scheme invests the Government with the power to intrude into the privacy of ordinary citizens"—a power with "vast potential for abuse"— "courts must take care to ensure that an administrative search is not subverted into a general search for evidence of crime." (citations omitted)).[15]

**[6]** Nevertheless, where—as here—the search is " 'undertaken *pursuant to a general scheme without individualized suspicion*,' " *Al-Kidd*, 131 S. Ct. at 2081 (quoting *Edmond*, 531 U.S. at 45-46), consideration of the government actor's actual motivation has been limited to an inquiry into the *programmatic* purposes motivating the search, *see Edmond*, 531 U.S. at 47; *accord Al-Kidd*, 131 S. Ct. at 2081. The Supreme Court has cautioned that this inquiry "is *not* an invitation to probe the minds of individual officers acting at the scene." *Edmond*, 531 U.S. at 48 (emphasis added) (citing generally *Whren*, 517 U.S. 806).

Accordingly, this court has held that where a warrantless search is conducted pursuant to a lawful administrative scheme with a constitutionally permissible motivation, "the subjective motive of the individual conducting the search will not invalidate the search." *See Bulacan*, 156 F.3d at 966-67 (citing *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993)). *See also United States v. Tsai*, 282 F.3d 690, 695-96 (9th Cir. 2002) (applicability of the exception to the probable cause requirement "turns more on examination of the search's

---

[15]*Cf. Al-Kidd*, 131 S. Ct. at 2082 (describing administrative searches as "less protective" than searches pursuant to warrants); *Whren*, 517 U.S. at 811-12 ("the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are *not* made for those purposes").

scope than on an inquiry into the searcher's motivation"). In *Bowhay*, a police officer searched an arrestee's bag pursuant to a standard inventory search policy that required inventory of all evidence brought to the police station. 992 F.2d at 230. We held that the fact that the officer had an unlawful secondary search purpose in mind when he searched the bag— hoping to find contraband inside—did not invalidate the otherwise lawful administrative inventory search because the searching officer's actions would have been the same regardless of his "true" motivation. *Id.* at 231.

Similarly, *Bulacan* examined the effect of an unlawful secondary purpose—the goal of searching for narcotics—on an otherwise valid administrative search, where the officers performed administrative searches of all entrants to a federal building. 156 F.3d at 965. The agents were required, pursuant to a federal regulation and instruction, to search the bags of all entrants for both safety hazards and vice items such as narcotics, alcohol, or gambling materials. *Id.* at 965-66. However, unlike in *Bowhay*, the officers had unfettered discretion in determining which bags or containers to search, based on their own individual judgment. *Id.* at 966. We held that, where the officer had "broad discretion as to the parameters of the search," the addition of the programmatic motive to search for narcotics, which was not legitimately related to the constitutional administrative search for safety purposes, led to the impermissible extension of the scope of the search, "regardless of whether the items searched could have been subject to a valid administrative search." *Id.* at 970.

Central to *Bulacan*'s holding was that the search scheme itself imposed an additional, impermissible motive unrelated to administrative purposes, such that individual officers, in exercising the broad discretion granted them, could conduct more extensive searches based on the secondary law enforcement-related motive. *See id.* at 971, 973 ("[W]hen an administrative search scheme encompasses both a permissible and an impermissible purpose, and when the officer conduct-

ing the search has broad discretion in carrying out the search, that search does not meet the Fourth Amendment's reasonableness requirements."). We were concerned that the secondary motive explicit in the search scheme would necessarily infect the primary search motive, altering the scope of the search. *Id.* at 971.

Likewise, in *$124,570 U.S. Currency*, we held an airport search of a passenger's baggage, pursuant to an established policy providing a $250 reward for screeners reporting discovery of large sums of U.S. currency, could not be upheld as a valid administrative search because the policy injected into the administrative search scheme—at the programmatic level—an impermissible secondary purpose, and screeners with broad discretion to decide what bags to search necessarily could not separate the permissible from the impermissible motive. 873 F.2d at 1245-47 & n.3; *see also id.* at 1246 (noting that "the policy of 'work[ing] hand-in-hand with U.S. Customs and Port Police regarding the detection and reporting of drugs and U.S. currency' will very likely influence [transportation security] officers to conduct more searches, and more intrusive searches, than if they focus on air safety alone" (first alteration in original)).[16]

---

[16]Although *$124,570 U.S. Currency* involved an airport search, similar to this one, in which a bag was flagged as having an unidentifiable dense mass by an X-ray machine, we did not premise our holding on the subjective intent of the officer. Rather, we found that the impermissible search *scheme*, combined with broad discretion in which containers to search, invalidated the simultaneous lawful administrative search *from the outset*. *See* 873 F.2d at 1247. We emphasized that

> [n]othing we say today precludes [transportation security] officers from reporting information pertaining to criminal activity, as would any citizen. *We see the matter as materially different where the communication is undertaken pursuant to an established relationship, fostered by official policy, even more so where the communication is nurtured by payment of monetary rewards.* The line we draw is a fine one but, we believe, one that has constitutional significance.

*Id.* at 1247 n.7 (emphasis added).

In determining that Andrade's subjective intent to search for child pornography would have invalidated an otherwise lawful search if the search was one of dual purposes, the district court emphasized that Andrade had broad discretion, similar to the discretion afforded officers in *Bulacan*, in how deeply she searched McCarty's bag. *McCarty*, 672 F. Supp. 2d at 1098. This was error resulting from conflation of the applicable law. That the TSA screener here might have had discretion as broad as the screener in *$124,570 U.S. Currency* or *Bulacan* is immaterial to our analysis because, unlike *Bulacan* and *$124,570 U.S. Currency*, it is undisputed that here there was no programmatic secondary purpose—Andrade did not receive any reward for finding contraband, and searching for evidence of a crime was not part of her assigned duties. The TSA search scheme under which she operated was focused solely on the discovery of threats to air travel safety. Thus, the inquiries into discretion and search intent outlined in *Bulacan* and *$124,570 U.S. Currency* are simply inapplicable here because the "purpose inquiry in [the context of intrusions undertaken pursuant to a general scheme without individualized suspicion] is to be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene." *Edmond*, 531 U.S. at 45-46.

Of course, to say that we conduct the Fourth Amendment inquiry "only at the programmatic level" is not to say that a lawful administrative search intent, engaged at the inception of the search but later abandoned, provides carte blanche to the searching officers to snoop to their hearts' content without regard to the scope of their actions. The search must still be "in furtherance" of the administrative goal, *Davis*, 482 F.2d at 908, "no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives[,] . . . [and] confined in good faith to that purpose," *id.* at 913.

**[7]** So, as long as (1) the search was undertaken pursuant to a legitimate administrative search scheme; (2) the search-

er's actions are cabined to the scope of the permissible administrative search; and (3) there was no impermissible programmatic secondary motive for the search, the development of a second, subjective motive to verify the presence of contraband is irrelevant to the Fourth Amendment analysis. *See id.*; *Edmond*, 531 U.S. at 45-46; *Aukai*, 497 F.3d at 962; *Bulacan*, 156 F.3d at 967-68; *Bowhay*, 992 F.2d at 231. Thus, the presence here of a secondary desire to confirm that the items searched might be contraband could not, in and of itself, invalidate the initially constitutional administrative search Andrade conducted, at least as long as she actually engaged in a search for explosives and her actions were no more intrusive than necessary to clear the bag of any safety concerns. *See Bowhay*, 992 F.2d at 231 ("When the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation." (citing *Horton v. California*, 496 U.S. 128 (1990))). The subjective intent of the individual officer in such a search thus becomes as relevant as objective conduct only at the point at which the search ceases legitimately to be for the valid administrative purpose, as that is the point after which the administrative exception can no longer justify continuation of the warrantless search.

### 2. *Defining Search Scope*

The crux of the issue, then, involves two related questions: (1) when did Andrade's administrative search for explosives truly end, and become a wholly independent search for evidence of child pornography?; and (2) which of Andrade's actions exceeded the scope of the administrative search by becoming "more extensive [or] intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives"? *Davis*, 482 F.2d at 913.

In a typical case, lines of permissibly cabined and impermissibly extended search actions are easy to identify—in *Aukai*, for instance, we noted that a TSA screening of airline

passengers and their carry-on luggage was appropriately limited where TSA screeners escalated the invasiveness of their search after each level of screening produced a reason to search more closely. 497 F.3d at 962. We reasoned that taking such a stairstep approach—first wanding a passenger after a magnetometer alerted to the presence of metal on the passenger's body, then asking the passenger to remove items from his pocket, and ultimately only feeling the outside of the passenger's pocket after the passenger failed to remove all of the contents upon request—was both minimally intrusive and respectful of personal privacy. Each level of increased invasiveness in the search was necessary and tailored to dispel the safety concerns presented. *See id.*

[8] By contrast, where an action is taken that cannot serve the administrative purpose—either because the threat necessitating the administrative search has been dismissed, or because the action is simply unrelated to the administrative goal—the action clearly exceeds the scope of the permissible search. *Cf. United States v. Miles*, 247 F.3d 1009, 1014-15 (9th Cir. 2001) (police officer exceeded scope of permissible *Terry* frisk where he continued to manipulate a box in a defendant's pocket after having concluded that the box could not possibly be a weapon, as "[h]e had no cause to shake or manipulate the tiny box on the pretext that he was still looking for a weapon"); *United States v. $557,933.89*, 287 F.3d 66, 82 (2d Cir. 2002) (suggesting that airport security personnel would exceed permissible search scope if they "looked into areas or opened packages which could not possibly contain weapons or explosives").

[9] Here, the scope of the permissible search—mandated by the TSA protocol—was defined by the point at which the screener was convinced the bag posed no threat to airline safety. Once Andrade was sufficiently certain that there were no explosives or other safety hazards hidden inside McCarty's bag, the administrative search was over—nothing else was required to detect threats to aircraft safety. As the district

court correctly reasoned, any search actions taken thereafter would impermissibly extend the scope of the search beyond what was necessary, because they could not possibly meet the requirement that the screener's actions be " 'strictly tied to and justified by the circumstances which rendered [the search's] initiation permissible.' " *Davis*, 482 F.2d at 911 n.49 (internal quotation marks omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)); *see also Aukai*, 497 F.3d at 962.

**[10]** Andrade conceded that, at the point when she read the content of the letters and looked at the newspaper articles and advertisements, she was no longer searching for explosives. Rather, at that point, she had abandoned the search for safety hazards and was reviewing the items to confirm her feeling that the photographs were contraband evidencing children in harm's way. DCD #57 at 81-85. These actions were indisputably part of an effort to verify the presence of child pornography. Thus, the actions taken in this portion of the search clearly fell outside the permissible scope of the lawful administrative search and violated McCarty's Fourth Amendment rights because they were more extensive and intrusive than necessary to detect air travel safety concerns. *See Davis*, 482 F.2d at 913.

But the district court found that other portions of Andrade's search exceeded the scope of the lawful administrative search as well. Based on Andrade's "testimony and lack of credibility, the court specifically [found] that [she] searched the photographs in the envelope not for sheet explosives but for evidence of child pornography." *McCarty*, 672 F. Supp. 2d at 1097 n.8. It thus cabined the extent of the lawful search to just the first few photographs that spilled onto the search table, and found that the photographs and other items in the envelope had only been discovered as a result of an "overbroad investigation into the criminal nature of the photographs." *See id.* at 1099.

We are mindful that factual findings of this type are entitled to great deference and should be reversed only where a thor-

ough reading of the record leads us to the "definite and firm conviction that a mistake has been made." *Husain*, 316 F.3d at 835 (internal quotation marks omitted). Nonetheless, we can find no support in the record for the district court's conclusion that Andrade searched the photographs in the envelope for evidence of child pornography.

At one point in its decision, the district court asserted that Andrade had conceded that she was reviewing the contents of the envelope—including the photographs therein—solely out of concern for the children depicted. *McCarty*, 672 F. Supp. 2d at 1094 (referencing DCD #57 at 81-83). It is upon this statement that the district court based its factual finding that Andrade was not searching for sheet explosives when she looked through the photographs in the envelope. *Id.* at 1097-98. However, a review of the transcript reveals that Andrade's concession was limited to a statement that when she read lines from the newspaper clippings and the letters—which occurred after she had inspected the initially spilled photographs and a small portion of the photographs in the envelope—her reading was focused on determining whether the children had been harmed. DCD #57 at 61-62, 81-82. Andrade did not at any point state that she had abandoned her primary search for aircraft safety hazards at the time she viewed the *photographs* in the envelope.

The district court also stated that "Andrade testified that she went through some of the photographs on the table because she 'felt that the children were in a harmful way' and 'needed to see more before I called my lead.' " *McCarty*, 672 F. Supp. 2d at 1097 (citing DCD #57 at 61-62). The record contradicts this conclusion. Although the long question posed to Andrade before she made those statements did reference her perusal of the photographs as part of a chronology of her actions, the part of the question soliciting an answer did not; it merely asked Andrade "why did you go through those testimonies?" DCD #57 at 61-62 (referring to Andrade's having

read a few lines of the letters).[17] Andrade went on to clearly and repeatedly testify that she viewed the photographs in the envelope for the purpose of investigating the "possible massive dark area" on which the CTX machine alarmed, and to determine if any sheet explosives were hidden therein. *See* DCD #57 at 63 ("I needed to go through the envelope itself because of the possible massive dark area."); 76 (correcting defense counsel when he suggested that she began looking through the materials in the envelope to see what the contents were about: "Not check exactly what it was. I needed to finish my check as far as the massive dark area."); 86 (noting that, after looking at the photographs that spilled onto the table but before looking at the newspaper clippings or letter, she "went into the envelope to see if there was anything hidden in the envelope"); 89 (noting that she could not determine that there was no safety concern, with respect to explosives, just by pulling the photographs out of the envelope; she had to do a physical search of the items); 95 (correcting defense counsel's assertion that at the point she pulled the photographs out of the envelope, she was no longer concerned with the safety of the dense mass identified by the scanner: "I still was.").

Indeed, defense counsel asked Andrade repeatedly whether she was still searching for explosives and other safety con-

---

[17]The complete inquiry reads as follows:

Q: So procedurally I want to go through what happened at that point when you decided to go through these items.

Okay. When you went through the items, you looked at you said less than half the photographs, there was these other items that you testified to, these ads, newspaper clippings, and letters, why did you go through those testimonies?

A: Because I felt the children were in a harmful way.

THE COURT: I'm sorry, I did not understand your answer.

THE WITNESS: I felt that I needed to see more than what I saw before I called my lead.

DCD #57 at 61-62.

cerns when she *read* materials from the envelope, and Andrade confirmed on each occasion that she was concerned only about the children in the photos at that point. *Id.* at 83-85 (confirming four times that at the time she began to read the *other* items in the envelope—including the newspaper articles and the letters—she was no longer concerned with safety but needed to know what the nude pictures were about). However, when defense counsel asserted that Andrade had searched all of the items in the envelope for the purpose of determining what the nude photographs were about, Andrade corrected him, stating "No . . . I need to determine if there was anything hidden in the pictures — rest of the pictures in the envelope . . . . Because of the massed area. I needed to continue my search." *Id.* at 85.[18]

**[11]** However unclear Andrade's testimony was on other points—exactly which images she saw, how many photographs spilled onto the table, and whether she touched or did not touch the photographs on the table before calling the lead officer—she was consistently clear and emphatic that when she looked through the photographs in the envelope, she was still acting to ensure that there were no sheet explosives hidden inside. No testimony in the record contradicted hers on this point. Further, this search intent was consistent with the TSA protocol requiring Andrade to thumb through the photographs in order to clear the bag. The district court's factual conclusion on this point is without support in the record, and must be vacated.[19]

---

[18]Indeed, the prosecutor objected to defense counsel's question on this point as misstating Andrade's testimony; the district court overruled the objection. DCD #57 at 85.

[19]That the TSA screener did not flip through the entire stack of photographs before calling her supervisor does not undermine our conclusion. We find it troubling that the district court treated the fact that the search was not completed as a strong indicator that Andrade's testimony was not credible. *See McCarty*, 672 F. Supp. 2d at 1098. A review of the testimony presented shows that only a few short minutes passed between the time the

**[12]** Thus, the screener's review of the photographs in the packet occurred within the scope of the ongoing lawful administrative search. As a result, her discovery of their nature coincided with her search for explosives, rather than followed the formation of an independent and exclusive intent to search for contraband. Accordingly, Andrade's viewing of the photographs from the envelope was justified by and part of the lawful administrative search, *see Aukai*, 497 F.3d at 962, and—as we clarified above—even the development of a secondary desire to confirm that the photographs evidenced contraband did not invalidate that search, *see Bowhay*, 992 F.2d at 231.

## B.   Probable Cause and Suppression

After reaching its conclusion that Andrade's search of the photographs quickly went beyond the bounds of a proper administrative search, the district court considered whether the photographs lawfully seen by the screeners provided probable cause to arrest McCarty. It answered that question by attempting to determine whether the lawfully-viewed photographs constituted child pornography. This approach was erroneous.

**[13]** To show that the police had probable cause to arrest McCarty, the government is required to prove only that " 'at

CTX machine alarmed on the bag and the time law enforcement was called, DCD #57 at 201, and the TSA lead officer was already in the room when Andrade began the lawful search. Given the timeframe within which the events occurred, we are unsurprised that the TSA screener did not complete the thumb through before her lead came over to see what possible contraband had been found, and we think this fact should not subvert the notion that a complete—or at least further—protocol search would have been required to dispel any safety concerns after viewing the initial photographs. Supporting our reasoning is the fact that although Andrade did not finish clearing the bag of safety concerns *herself* before calling the lead, TSA Supervisor Kamohai did so. *Id.* at 95.

the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.' " *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (quoting *United States v. Bernard*, 623 F.2d 551, 559 (9th Cir. 1980)). Under this objective standard, the government need not "show[ ] that the officer[s'] belief is more likely true than false," *United States v. Brobst*, 558 F.3d 982, 997 (9th Cir. 2009), and need not demonstrate "probable cause for every element of the offense," *Blankenhorn v. City of Orange*, 485 F.3d 463, 472 (9th Cir. 2007) (internal quotation marks omitted). Instead, the government must show that the officers had an objectively reasonable belief that McCarty committed a crime, based on the totality of the relevant circumstances. *See Luchtel v. Hagemann*, 623 F.3d 975, 979 (9th Cir. 2010). Accordingly, the government is *not* required to prove that all or any of the photographs *actually exhibited* child pornography in order to establish probable cause for McCarty's arrest.[20]

[14] On remand, the district court's probable cause determination should proceed in two steps. First, the court should decide what materials may be considered in determining whether probable cause existed to arrest McCarty. As *Jensen*

[20]*Cf. United States v. Hill*, 459 F.3d 966, 972-73 & n.9 (9th Cir. 2006) (while a single photo of a naked child in a bathtub would not suffice to establish probable cause for a search warrant, a detailed description of two photographs of semi-nude girls revealing their breasts and pubic areas, which could have been meant to " 'arouse or satisfy the sexual cravings of a voyeur,' " produced probable cause to believe that evidence of child pornography would be found on the defendant's computer, even if the defendant could negate their contraband nature at trial (quoting *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987))); *United States v. Moore*, 215 F.3d 681, 686-87 (7th Cir. 2000) (finding that photos of nude children, including some depicting nude boys in nature scenes that were not necessarily sexually suggestive and some depicting nude girls in sexually suggestive poses, produced probable cause to effect a warrantless arrest for possession of child pornography).

illustrates, courts generally consider the information known to the arresting officers at the time of the arrest. Here, Serrao testified that he had viewed all of the photographs in McCarty's envelope and perhaps also some of the textual materials before making the arrest.

The general rule must, however, be narrowed here, because the fruits of an unlawful search cannot provide probable cause for an arrest, *see Johnson v. United States*, 333 U.S. 10, 16-17 (1948), and it is clear some portion of this search was unlawful. Although—consistent with our enumeration of the search's lawful scope—all of the photographs viewed by the screeners as part of the lawful search for explosives must be considered in reaching a probable cause determination, the textual materials seen by the screeners may only be considered if the government demonstrates that suppression is an inappropriate remedy. Similarly, the photographs *not* viewed by the screeners may be considered only if they do not constitute fruit of the poisonous tree. *See, e.g.*, *United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir. 2003) (listing the independent source, inevitable discovery, and attenuated basis exceptions to the rule that evidence discovered as a result of an illegal search must be excluded).[21]

Once the district court determines which evidence may be considered as part of the probable cause determination, it must determine whether that evidence was "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Jensen*, 425 F.3d at

---

[21]Although the government raised an inevitable discovery-type theory in its opposition to McCarty's motions to suppress all evidence, *see* DCD #61 at 12-13 (contending that the TSA officers would inevitably have discovered the entire contents of the envelope, including all of the photographs, had they not stopped the administrative search before completion in order to call law enforcement), the district court did not consider this theory in its order granting McCarty's motion to suppress. We express no opinion as to the merits of this argument, but note that the district court may wish to consider it on remand.

704. Again, we stress that, to meet this standard, the government does not need to prove that the arresting officers *knew* McCarty had committed a crime, but only that the officers' belief that McCarty committed crimes related to child pornography was an objectively reasonable one.

**[15]** Finally, the district court held that suppression was an appropriate remedy for the screeners' overbroad search. Because this conclusion rested on the district court's erroneous finding that the screeners searched McCarty's photographs for evidence of child pornography, we vacate this holding and remand for the district court to reconsider whether suppression is appropriate in light of our conclusions here.

## CONCLUSION

The order suppressing the evidence obtained as a result of the airport screening and the follow-on consent- and warrant-based searches of McCarty's computer and other materials is vacated, and the case remanded to the district court for further proceedings consistent with this Opinion.

**VACATED and REMANDED.**