
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  35848-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LANNY LEE GRIFFITH, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — We are presented with a question of first impression in Washington: are warrantless, suspicionless, state courthouse security screenings constitutional, particularly if they include a search for controlled substances, either by design or as carried out in a particular case?

The Chelan County Superior Court refused to suppress methamphetamine found in a pocket of Lanny Griffith's coat in the course of security screening that took place at the county courthouse.  Applying well-settled law under the Fourth Amendment to the United States Constitution and a novel question under the Washington Constitution, we hold that if the security guard's action in removing methamphetamine from the coat pocket was not cabined to the scope of a permissible administrative search, the evidence should have been suppressed.  Because there is a factual dispute whether the security

guard's actions were consistent with the county's security screening policy, we remand

for additional fact finding. Since the record provides insufficient evidence of Mr.

Griffith's voluntary and knowing waiver of a jury trial, a new trial is ordered in the event

the suppression motion is denied following the entry of additional findings.

FACTS AND PROCEDURAL BACKGROUND

In January 2017, Lanny Griffith went to the Chelan County Superior Courthouse

to make a payment toward legal financial obligations (LFOs). He proceeded to the fifth

floor, where, in order to continue to the clerk's office, he had to go through a security

screening. The security screening station was equipped with a magnetometer, which

visitors were required to pass through after first placing items from their pockets in a

basket. If a visitor set off the magnetometer, they were scanned with a hand wand. There

was no X-ray device at the screening station, so bags and heavy coats were subject to a

manual search.

The security officer on duty at the fifth floor security station was private security

guard James Mattix, who directed Mr. Griffith to empty his pockets and take off his coat.

When Mr. Mattix searched the coat, he found a small clear ziplock bag of what appeared

to be methamphetamine in a pocket. Mr. Mattix contacted his supervisor, Chelan County

Deputy Sheriff Elgin Shaw, to report the discovery. Upon arriving at the security

screening station and agreeing that the contents of the ziplock bag looked like

methamphetamine, Deputy Shaw placed the bag in a locked desk and notified Wenatchee

2

police, who dispatched Officer Shawndra Duke to respond. The contents of the bag proved to be methamphetamine, and the State charged Mr. Griffith with one count of possession of a controlled substance (methamphetamine).

Mr. Griffith moved to suppress the seized methamphetamine, arguing that administrative weapons searches that have a dual purpose of searching for drugs violate the Fourth Amendment and article 1, section 7 of the Washington State Constitution. At a two-day CrR 3.6 hearing, the trial court heard extensive testimony from Mr. Mattix, from Deputy Shaw, and from Officer Duke.

Fourteen unchallenged findings of fact by the trial court summarize most of the relevant evidence presented at the hearing:

1. On January 6, 2017, Mr. Lanny Griffith entered the 5th Floor of the Chelan County Superior Courthouse;

2. Upon entering the 5th Floor from either the stairs or the elevator, Mr. Griffith would have seen the sign, a picture of which was admitted as Exhibit 1, informing him that all visitors were subject to security screening;

3. Any individual not desiring to pass through screening may leave at any time back down the stairs or elevator prior to passing through the magnetometer;

4. Security screenings are conducted by private security officers who are trained and supervised by Chelan County Jail Deputy Elgin Shaw to search for weapons;

. . . .

6. Mr. Griffith approached the security screening station, staffed by private security officer James Mattix;

7. Mr. Mattix observed that Mr. Griffith wore a heavy Carhartt-style coat;

8. Although not a formal policy or directive, Mr. Mattix uniformly requires all individuals with heavy jackets to remove the jacket for individual screening before the individual passes through the magnetometer;

9. Mr. Mattix uniformly requires the same for all briefcases, purses, backpacks, and other containers;

10. In the present case, Mr. Mattix asked Mr. Griffith to remove and hand-over the jacket for screening and Mr. Griffith complied;

11. While hand-searching the outside of the jacket, Mr. Mattix felt a soft bulky object in one of the pockets and removed it;

12. The object was a plastic baggie containing a small amount of methamphetamine;

13. There is some dispute whether Mr. Mattix also removed a cell phone from that same pocket in that Mr. Mattix testified that he did, but Officer Duke and Deputy Shaw testified that Mr. Mattix had told them that the cell phone had been handed over prior to the coat search;

. . . .

15. Some individuals are allowed to pass through security without undergoing screening, including mail and parcel delivery personnel, the local legal process server, the local bail bondsman, on-duty law enforcement officers, and current county employees; [and]

16. Although not in writing, these exceptions are authorized by the County Commissioners and security screening personnel do not have discretion to except other individuals, nor is there evidence that the screening personnel vary from these authorized exceptions.

Clerk's Papers (CP) at 37-38.

The disputed evidence noted in finding 13 had to do with Mr. Mattix's testimony

at the suppression hearing that the reason he reached into Mr. Griffith's coat pocket was

because he felt a hard object that turned out to be Mr. Griffith's cell phone. Officer Duke

and Deputy Shaw provided conflicting testimony; both testified that in speaking with Mr.

4

Mattix on the day the methamphetamine was seized, he told them Mr. Griffin had placed his wallet and cell phone in a basket before handing over his coat.[1]

The trial court's finding 14, one of three findings challenged on appeal, states:

> 14. The Court does not resolve th[e] dispute of fact [over whether Mr. Mattix had already removed a cell phone from the pocket] because the Court does not believe it necessary for this motion.

CP at 38.

Deputy Shaw testified during the CrR 3.6 hearing that he trains security officers to have people remove their coats, excluding suit jackets, and to physically check the coats and to reach into a pocket "[i]f they feel something rigid or hard, that could be a weapon." Report of Proceedings (RP)[2] at 50. He testified he instructs his officers that "[i]f it isn't rigid, and you cannot believe it might be a weapon, then you're not to reach in that pocket." *Id.* at 69. He testified that if the security officers find drugs, they are to lock the drugs in a desk at the security station and call him, which was the procedure followed by Mr. Mattix.

Mr. Mattix testified that when he is searching someone's coat, his "main goal" is to look for weapons, later explaining that while his "primary purpose is to search for

---

[1] Deputy Shaw's incident report and Officer Duke's police report lend support to their testimony that what they were told by Mr. Mattix on the day of the incident conflicted with his testimony at the CrR 3.6 hearing. Mr. Mattix was not required to prepare a contemporaneous report, nor did he.

[2] Unless otherwise cited, all RP cites refer to RP (Sept. 28, 2017).

5

weapons," his secondary purpose is contraband. *Id.* at 36, 38. He testified that when checking the pockets of a coat, he will feel and "[i]f there's anything hard, that's going to lead me to the pocket, I'm going to check the pocket. If there's nothing there, there's no reason to check the pockets." *Id.* at 10. Later, however, he testified that even if he feels something soft, he is "still going to look." *Id.* at 38. Asked why, he said: "Curiosity. Got to know what it is." *Id.*

Finally, Mr. Mattix testified to his understanding of the dangers of certain drugs— in particular, fentanyl. He testified that based on his personal reading and research on fentanyl, he believed "it would take just a couple micrograms, to drop me on the floor, overdose." *Id.* at 41. He testified that the security company for which he worked had trained him to recognize marijuana, heroin, methamphetamine, cocaine, LSD,[3] and psilocybin. He acknowledged that he had received no training on chemical or biological weapons.

At the conclusion of the suppression hearing, the trial court orally denied the motion to suppress. In written findings and conclusions entered thereafter, the trial court gave two reasons for its conclusion that the search was valid. The first was that Mr. Griffith impliedly consented to the search, since he had the opportunity to leave rather than be searched and had willingly relinquished his coat to Mr. Mattix. The second was

---

[3] Lysergic acid diethylamide.

that the search was a valid administrative search under the federal and state constitutions because it was conducted as part of a uniform process for searching for weapons and other dangerous objects, Mr. Mattix lacks discretion on who to search, and the discovery of drugs was incidental to a search for dangerous objects. Citing *State v. Book*, 165 Ohio App. 3d 511, 2006-Ohio-1102, 847 N.E.2d 52, the trial court concluded that modern drugs such as fentanyl pose a sufficient danger to the public to justify being the object of an administrative search in a courthouse in and of themselves.

Following the decision on the suppression motion, Mr. Griffith agreed to a stipulated facts trial. He did not sign a waiver of trial by jury or agree in open court to waive his jury trial right. The trial court clearly assumed there had been a waiver of jury trial and, after considering the stipulated facts, it found Mr. Griffith guilty as charged. Mr. Griffith's sentence was stayed pending this appeal.

## ANALYSIS

Mr. Griffith assigns error to the trial court's denial of his motion to suppress and to its finding him guilty following a stipulated facts trial, absent a valid waiver of his constitutional right to trial by jury. We address his challenge to the suppression decision before turning to the alleged violation of his jury trial right.[4]

---

[4] Mr. Griffith also challenges the imposition of certain LFOs, but since our disposition of other assignments of error will result in suppression of the methamphetamine or a new trial, the LFO issues are moot.

7

No. 35848-8-III
*State v. Griffith*

I.    SUPPRESSION DECISION

The State does not defend the suppression decision on the basis of implied

consent, acknowledging that *implied* consent is no longer an accepted justification for

administrative searches.[5]  At issue is only whether the search was otherwise valid under

the federal and state constitutions.

We generally review a trial court's denial of a motion to suppress for substantial

evidence.  *State v. Schultz*, 170 Wn.2d 746, 753, 248 P.3d 484 (2011).  "Substantial

evidence exists where there is a sufficient quantity of evidence in the record to persuade a

fair-minded, rational person of the truth of the finding."  *State v. Hill*, 123 Wn.2d 641,

644, 647, 870 P.2d 313 (1994).  We review the legal conclusions of the trial court de

novo.  *Schultz*, 170 Wn.2d at 753.

When presented with arguments under both the state and federal constitutions, our

Supreme Court generally favors independent interpretation and application of the

Washington Constitution first, reasoning that such review will develop a body of

independent jurisprudence and that consideration of the United States Constitution first

---

[5] The State cites as authority 5 WAYNE R. LAFAVE, SEARCH & SEIZURE § 10.6(g)
(5th ed. 2012) and *United States v. Aukai*, 497 F.3d 955, 959-60 (9th Cir. 2007)
(discussing *United States v. Biswell*, 406 U.S. 311, 92 S. Ct. 1593, 32 L. Ed. 2d 87
(1972)).  Br. of Resp't at 15 n.3.  Mr. Griffith points out that the Washington Supreme
Court expressed skepticism about consent as justification for a search early on, in
*Jacobsen v. City of Seattle*, 98 Wn.2d 668, 674, 658 P.2d 653 (1983) ("[E]ven if the
consent issue had been raised . . . it is extremely doubtful, given the circumstances of this
case, that they could have prevailed.").

8

would be premature. *City of Seattle v. Mesiani*, 110 Wn.2d 454, 456, 755 P.2d 775 (1988). Because the Fourth Amendment's requirements for suspicionless area-entry searches are well settled, however, and our Supreme Court has frequently evaluated administrative searches applying Fourth Amendment requirements, we begin by applying federal law.

As will be seen, applying the Fourth Amendment requires remand for additional findings but not outright reversal of the suppression decision. Mr. Griffith argues that outright reversal *is* required by the Washington Constitution, so we follow our Fourth Amendment analysis with an analysis under the Washington Constitution.

A. The reasonableness of the search of Mr. Griffith under the Fourth Amendment turns on an as-yet unresolved dispute of fact

The Fourth Amendment to the United States Constitution provides in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. A determination that the Fourth Amendment applies to a search or seizure is followed by a review of its reasonableness, and "what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985)

9

(quoting *Camara v. Mun. Court*, 387 U.S. 523, 536-37, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)).

To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. *Chandler v. Miller*, 520 U.S. 305, 313, 117 S. Ct. 1295, 137 L. Ed. 2d 513 (1997). But in 1967, the United States Supreme Court's decision in *Camara* introduced what came to be called an "administrative search" doctrine under which area regulatory inspections were permitted so long as "reasonable legislative or administrative standards" were in place and were satisfied in each case. 387 U.S. at 538. The Supreme Court found it reasonable to dispense with a requirement of traditional probable cause where an administrative inspection was "neither personal in nature nor aimed at the discovery of evidence of crime," involved a "relatively limited" invasion of privacy, and was the only effective way to enforce compliance with municipal codes. *Id.* at 537.

The administrative search doctrine was supplanted by a broader "special needs" doctrine under which particularized exceptions are sometimes warranted where a search or seizure is directed toward "'special needs, beyond the normal need for law enforcement'" and "'the warrant and probable-cause requirement[s are] impracticable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987) (quoting *T.L.O.*, 469 U.S. at 351 (Blackmun, J., concurring in judgment)). When concerns other than crime detection are alleged in justification of a Fourth Amendment

10

intrusion, courts undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties. *Chandler*, 520 U.S. at 314. "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner v. Ry. Labor Execs.' Assn.*, 489 U.S. 602, 624, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989).

Federal courts have found this special need for suspicionless searches to apply to area-entry searches at government buildings and airports. *E.g.*, *United States v. Bulacan*, 156 F.3d 963, 967-68 (9th Cir. 1998) (federal building); *McMorris v. Alioto*, 567 F.2d 897 (9th Cir. 1978) (state courthouse); *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1244 (9th Cir. 1989) (airport). The State and Mr. Griffith agree that the area-entry search in this case was an administrative search under Fourth Amendment law to which the special needs exception applies.

Federal courts have held that while the purpose of a special needs search is not crime detection, an item in plain view whose incriminating nature is immediately apparent may be seized in such a search, and may be used in a criminal prosecution. *Bulacan*, 156 F.3d at 968. A relatively recent area-entry decision, *United States v. McCarty*, 648 F.3d 820 (9th Cir. 2011), illustrates the current state of Fourth Amendment

11

law on the admissibility of evidence of contraband that is found during an area-entry search.

*McCarty* involved a search by a TSA[6] agent at an airport of a piece of checked luggage that, while passing through an X-ray device, "alarm[ed]" to a dense item, stopping the procession of bags through the screening area. *Id.* at 824. When such an alarm occurs, the TSA screener is required to find and examine the dense item to ensure it is not an explosive device. *Id.* at 824-25. The TSA screener located a laptop in the dense mass identified by the X-ray machine. In extracting it from the bag an envelope dropped to the table, from which spilled photographs. Since the photos might have been the dense mass identified by the X-ray machine, the TSA agent was required to leaf through them, because thin, flat, explosives called "sheet explosives" may be hidden in papers, photographs, or even a deck of cards. *Id.* at 825-26.

As the agent leafed through the photographs, she was disturbed to find that many appeared to be child pornography. After reviewing the photographs and other contents of the envelope, she notified her superiors who, following their own review, contacted local police. *Id.* at 827. McCarty was first charged under state law for promotion of child abuse; following further investigation, a federal grand jury returned a 10-count superseding indictment charging federal crimes. *Id* at 827-28.

---

[6] Transportation Security Administration.

The federal district court granted a motion to suppress all evidence seized as a result of the airport search, finding that the TSA agent's search went beyond the scope of an airport administrative search for weapons and/or explosives. *Id.* at 828. On appeal, the Ninth Circuit found no evidence to support the district court's finding that the TSA agent's initial leafing through the photographs fell outside the scope of a lawful administrative search. It concluded that regardless of her motive, the TSA agent's screening search was valid. *Id.* at 838.

Among the principles applied by the Ninth Circuit in reaching its decision were the following:

- Warrantless, suspicionless airport security searches, being subject to the reasonableness requirement of the Fourth Amendment, are constitutionally reasonable only if they are no more extensive or intrusive than necessary to detect the presence of weapons or explosives. *Id.* at 831.

- When a search is undertaken pursuant to a scheme without individualized suspicion, consideration of the searching officer's actual motivation is limited to an inquiry into the *programmatic* purposes motivating the search. The fact that the searching officer had an unlawful secondary search purpose in mind will not invalidate the search, since the officer's actions would have been the same with or without the improper objective. *Id.* at 833.

- While a screening agent's subjective motive may be irrelevant, his or her actions are relevant, and the agent's search must further the goal of the administrative search scheme. Administrative searches do not "provide[ ] carte blanche to the searching officers to snoop to their hearts' content without regard to the scope of their actions." *Id.* at 834.

The court summarized these principles in the following rule:

13

> [A]s long as (1) the search was undertaken pursuant to a legitimate
> administrative search scheme; (2) the searcher's actions are cabined to the
> scope of the permissible administrative search; and (3) there was no
> impermissible programmatic secondary motive for the search, the
> development of a second, subjective motive to verify the presence of
> contraband is irrelevant to the Fourth Amendment analysis.

*Id*. at 834-35.

Applying these principles to Mr. Mattix's search of Mr. Griffith's coat, the trial

court's findings support its conclusion that the search was conducted as part of a uniform

scheme to search for weapons and other dangerous objects only, satisfying the first and

third Fourth Amendment requirements. The factual dispute over whether Mr. Mattix felt

a cell phone in the pocket of the coat before extracting the baggie of methamphetamine

leaves unclear whether Mr. Mattix's actions were cabined to the scope of the permissible

administrative search, however. To resolve the Fourth Amendment challenge to the

search, the trial court needs to resolve the factual issue on which it demurred.

      B.     Evaluating the constitutionality of the search under article I, section 7 of the
            Washington Constitution

Mr. Griffith argues that even if Mr. Mattix's search was permissible under the

Fourth Amendment, it was not permissible under article I, section 7 of the Washington

State Constitution. He argues that (1) Washington courts have long condemned broad

suspicionless searches under article I, section 7, and (2) that reasonableness and good

faith do not justify warrantless searches under the Washington Constitution. We address

the arguments in turn.

14

1. Washington case law does not support Mr. Griffith's argument that the suspicionless nature of the search violates article I, section 7

Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7. Courts apply a two-step analysis to questions involving article I, section 7. The court first determines whether a "private affair" has been disturbed. "Private affairs" are "'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from government trespass.'" *State v. Maxfield*, 133 Wn.2d 332, 339, 945 P.2d 196 (1997) (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)).

If a "private affair" has been disturbed, the court determines whether "authority of law" justifies the intrusion. *State v. Surge*, 160 Wn.2d 65, 71, 156 P.3d 208 (2007) (plurality opinion). Authority of law includes a constitutional statute, a search warrant, or a recognized exception to the warrant requirement. *State v. Reeder*, 184 Wn.2d 805, 817, 365 P.3d 1243 (2015).

The Washington Supreme Court has observed that "we have a long history of striking down exploratory searches not based on at least reasonable suspicion." *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 314, 178 P.3d 995 (2008) (plurality opinion) (citing *State v. Jorden*, 160 Wn.2d 121, 127, 156 P.3d 893 (2007) ("[T]his court has consistently expressed displeasure with random and suspicionless searches, reasoning that they amount to nothing more than an impermissible fishing expedition." (alteration

15

in original))). But it has also found a number of statutes authorizing suspicionless searches to be constitutional, albeit often on only Fourth Amendment grounds. It has stated in dictum or in passing that administrative searches, including courthouse searches, are constitutional under article I, section 7. Finally, it has repeatedly kept open the possibility that in some context, a "special need" for suspicionless searching beyond normal law enforcement could be recognized as an exception to the warrant requirement under article I, section 7.

Searches conducted for civil rather than criminal purposes are often authorized by statute. In *Peninsula Counseling Ctr. v. Rahm*, 105 Wn.2d 929, 937, 719 P.2d 926 (1986), our Supreme Court held that a regulatory requirement for the suspicionless disclosure to the Department of Social and Health Services of patients' mental health records did not violate article I, section 7 because "[t]he limited nature of [the required] disclosure, carefully tailored to meet the legitimate goals of the State, justif[y] the resulting intrusions into the admittedly private affairs of the patients." Suspicionless statutory intrusions into private affairs were also found to be constitutional in *O'Hartigan v. Dep't of Pers.*, 118 Wn.2d 111, 119-20, 821 P.2d 44 (1991) (polygraph examinations of some applicants for state employment); *In re Juveniles A, B, C, D, E*, 121 Wn.2d 80, 96, 847 P.2d 455 (1993) (mandatory AIDs testing of convicted sexual offenders); and

16

*State v. Olivas*, 122 Wn.2d 73, 92-93, 856 P.2d 1076 (1993) (DNA[7] collection from

convicted felons for the purpose of creating a database).[8]  In the latter three cases, the

court applied only the Fourth Amendment, but one wonders why the court would not

have undertaken the analysis of the state constitutional issue if it perceived article I,

section 7 as prohibiting any intrusion not based on individualized suspicion.

Three decisions of our Supreme Court have identified "airport and courthouse

searches" as exceptions to the article I, section 7 warrant requirement in dictum.  *Olivas*,

122 Wn.2d at 84; *State v. Bradley*, 105 Wn.2d 898, 902, 719 P.2d 546 (1986); and

*Jacobsen v. City of Seattle*, 98 Wn.2d 668, 672, 658 P.2d 653 (1983).  While all three

speak of the constitutionality of such searches under the state constitution, both *Olivas*

and *Bradley* relied on *Jacobsen*, which cited only federal cases applying the Fourth

Amendment in identifying "airport and courthouse searches" as among the narrow

exceptions to the warrant requirement.  *Jacobsen*, 98 Wn.2d at 672.  The court went on in

*Jacobsen* to distinguish airport and courthouse searches from the pat-down searches of

---

[7] Deoxyribonucleic acid.

[8] Our Supreme Court revisited the constitutionality of the DNA collection statute in *Surge*, after the *Olivas* majority's rationale for finding it constitutional under the Fourth Amendment was called into question.  *Surge*, 160 Wn.2d at 79-80 (lead opinion). This time, the court addressed the constitutionality of the statute under article I, section 7, but no concern with suspicionless testing was addressed by the five members in the majority, who agreed that drawing a convicted felon's blood and analyzing its DNA for identification purposes did not intrude into a private affair.  160 Wn.2d at 74 (lead opinion); 160 Wn.2d at 82 (Chambers, J., concurring).

rock concert patrons that it found to violate article I, section 7 observing (as discussed further below) that "the situations at a rock concert are not comparable to the dangers posed at airports and courthouses." *Id.* at 673. Although the court did not analyze airport or courthouse searches under the Washington Constitution, it stated, in holding the concert pat-down searches unconstitutional, that such searches "are not analogous to airport or courthouse searches nor do they come under any other exception to the warrant requirement of the state and federal constitutions." *Id.* at 674. And in *York*, our Supreme Court cited this court's decisions as "adopt[ing] an approach to administrative searches similar to those enunciated in *Camara.*" 163 Wn.2d at 312 n.18 (lead opinion) (citing *Thurston County Rental Owners Ass'n v. Thurston County*, 85 Wn. App. 171, 183, 931 P.2d 208 (1997); *Murphy v. State*, 115 Wn. App. 297, 62 P.3d 533 (2003)).[9]

_____

[9] We prefer to confine our analysis to decisions of our Supreme Court. The ordinance cited in *Rental Owners* was readily found constitutional under article I, section 7 because absent a land owner's express consent to an inspection, the county was required to obtain a warrant. 85 Wn. App. at 183. In *Murphy*, this court provided an analysis more cursory than later decisions of our Supreme Court suggest is required. *See* 115 Wn. App. at 311-12.

This court's decision in *Robinson v. City of Seattle*, 102 Wn. App. 795, 10 P.3d 452 (2000), is also unhelpful, providing an analysis of *Juveniles* to which the Supreme Court referred dismissively in *York*. *York*, 163 Wn.2d at 313-14 (lead opinion) (discussing what this court "claimed" the Supreme Court did in *Juveniles*). In *Juveniles*, the Supreme Court analyzed two distinct issues: (1) whether HIV testing of sexual offenders was an unconstitutional search under the Fourth Amendment and (2) the separate question of whether it violated the federal right to privacy that is an aspect of the liberty protected by the due process clause of the Fourteenth Amendment—a right that includes the rights to nondisclosure of intimate personal information and autonomous decision-making. 121 Wn.2d at 96-97.

Finally, while our Supreme Court has so far not identified a context in which a

"special need" would support an exception to a requirement for individualized suspicion,

it has continuously kept open that possibility. The four-member lead opinion in *York*[10]

observed, "We have never adopted a special needs exception but have looked to federal

special needs cases when dealing with similar issues"; after discussing the federal

---

The *Robinson* court read *Juveniles* as inviting a *state* constitutional analysis under which article I, section 7 governs two distinct issues: (1) whether an intrusion is an unconstitutional search or seizure, and (2) whether it violates a general right to privacy. It assessed whether the intrusion violated a general right to privacy by applying the broad test for "private affair": a privacy interest that Washington citizens have held (and should be entitled to hold) safe from government trespass, without any downward ratcheting for diminishing expectations of privacy. *Robinson*, 102 Wn. App. at 818-19. If this general Washington right to privacy was violated, *Robinson* held that we apply the test applied if the federal privacy right was at issue: whether the State had acted with a narrowly tailored compelling state interest. As analyzed in *Robinson*, then, whether a matter is a "private affair" serves both as the threshold for the search and seizure analysis and also as the interest that, if present, requires demonstration of a narrowly tailored compelling state interest.

Contrary to the premise of *Robinson*, this court has held that article I, section 7 does not create a general right of privacy that is broader than the federal constitutional right of privacy. *Ramm v. City of Seattle*, 66 Wn. App. 15, 23, 830 P.2d 395, *review denied*, 120 Wn.2d 1018, 844 P.2d 437 (1992); *In re Custody of R.R.B.*, 108 Wn. App. 602, 617, 31 P.3d 1212 (2001). Our Supreme Court declined to decide the issue in *Bedford v. Sugarman*, 112 Wn.2d 500, 506, 772 P.2d 486 (1989), but has since cited *Ramm* for its holding that article I, section 7 does not create a general right of privacy different from the federal right. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 115, 937 P.2d 154 (1997) (lead opinion); *In re Custody of Smith*, 137 Wn.2d 1, 32, 969 P.2d 21 (1998) (Talmadge, J., concurring/dissenting), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

[10] One of the three signing justices, Justice Chambers, wrote a concurring opinion in addition to signing the lead opinion.

exception, it stated it was not adopting a special needs exception "[i]*n the context of* randomly drug testing student athletes." *Id.* at 312, 314 (lead opinion) (emphasis added); *and see id.* at 316 (lead opinion) (declining to adopt such a doctrine "*in the context of* randomly drug testing student athletes*" (emphasis added)). In a four-member concurring opinion, Justice Madsen expressed the belief that "a narrowly drawn special needs exception . . . is consistent with Washington law," and "rooted in . . . well-established common law principles" that the court had recognized in other cases. *York*, 163 Wn.2d at 316, 318 (Madsen, J., concurring).

Justice J.M. Johnson concurred in *York* in finding the school's drug testing program unconstitutional, beginning his concurrence with the observation that "[t]he lead opinion correctly notes that '[t]he question before us is narrow,' and its analysis is limited to this particular drug testing program." *York*, 163 Wn.2d at 330 (J.M. Johnson, J, concurring) (second alteration in original) (citing lead opinion at 303). Justice Johnson wrote that "[w]here the state demonstrates a 'special need,' the 'authority of law' requirement may be satisfied in select cases." *Id.* at 335.

In *State v. Olsen*, a dissenting opinion by Chief Justice Fairhurst discussed the special needs doctrine and, while expressing no interest in adopting it in the context of a requirement that a probationer convicted of driving under the influence (DUI) submit to random urinalyses (UAs), said of the doctrine, "we have contemplated [adopting it]

before." 189 Wn.2d 118, 140, 399 P.3d 1141 (2017) (citing *York*, 163 Wn.2d at 314, 329).

Most recently, in *Blomstrom v. Tripp*, the court was asked by the State to adopt a special needs analysis in the context of court orders imposing random UAs as a condition of pretrial release. The majority opinion again observed that the court had previously "left the door open" to adopting a special needs exception but "decline[d] to import the federal special needs test *in this context*." 189 Wn.2d 379, 410, 402 P.3d 831 (2017) (emphasis added); *and see id.* at 410. The dissenters would have held that court orders served as the requisite "authority of law." *Id.* at 417-18 (Gonzalez, J., dissenting in part).

In light of this authority, it cannot be said that the absence of individualized suspicion is fatal to Chelan County's security screening program under article I, section 7.

> 2. Recognizing a "special needs" exception in the context of area-entry searches provides a viable "authority of law"

For the courthouse search in this case to be constitutional under article I, section 7, either Chelan County policy or a "special needs" exception would have to provide the requisite "authority of law." We suspect that court or county policy or a "special needs" exception would have to provide the requisite "authority of law" for most, if not all, searches conducted in state courthouses in Washington. There is no statutory

authorization for security screening in Washington courthouses, and while GR 36[11] now

encourages the creation of security screening systems as part of courthouse security, it is

questionable whether it "authorizes" them; clearly, it does not provide guidance on how

they are to be performed. Also, because the rule did not become effective until

September 1, 2017, the rule post-dates the search of Mr. Griffith and likely the

introduction of most security screening at state courthouses.

No Washington decision has identified local government policy such as the

Chelan policy involved here as sufficient "authority of law" under article I, section 7.

A law review article cited with approval in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d

808 (1986)) speaks broadly enough of "authority of law" to encompass county policy,

describing a "literal" theory of article I, section 7 under which it

> justifies all of, and only, those home invasions or privacy disturbances
> authorized by statute, common law, *or perhaps, rules and express policies
> adopted by politically responsible institutions*. Put differently, official
> intrusion into protected interests could be justified only by the express
> authorization of the deliberative processes of government or by the sparse
> and tested principles of the common law. Express authorization, unless
> invalid under some other principle, would be judicially honored.

---

[11] GR 36 directs trial courts to form Court Security Committees, which should create Court Security Plans that address security operations, including "security screening for persons entering the court facility." GR 36(e)(1). Minimum Court Security Standards under the rule include "[w]eapons screening by uniformed security personnel at all public entrances . . . using, as a minimum metal-detector wand screening and physical examination of bags, briefcases, packages, etc." GR 36(g)(2). Archives for proposed rule GR 36 are available at http://www.courts.wa.gov/court_rules /?fa=court_rules.proposedRuleDisplayArchive&ruleId=529.

George R. Nock, *Seizing Opportunity, Searching for Theory: Article I, Section 7*, 8 U.

PUGET SOUND L. REV. 331, 347 (1985) (emphasis added) (cited by *Gunwall*, 106 Wn.2d

at 63 n.13). But *Gunwall*'s approving reference to the law review article does not extend

explicitly to its inclusion of "rules and express policies adopted by politically responsible

institutions" as "authority of law." No Washington decision has held that deliberate,

express governmental policy—as distinguished from legislation—constitutes "authority

of law" under article I, section 7.

Recognizing a special needs exception in the context of courthouse security

screening will provide a viable "authority of law," however. And Washington cases

support recognizing such an exception in this context. In *Jacobsen*, 98 Wn.2d at 674, the

Supreme Court held that "intensive pat-down searches by police officers of patrons

attending rock concerts" violated article I, section 7 in an opinion that did not find

courthouse and airport searches to be constitutional under the state constitution but

viewed them as presenting a distinguishable and valid concern:

> [T]he situations at a rock concert are not comparable to the dangers posed
> at airports and courthouses. . . . On the question of public security, one
> court has observed:
>
> > Warrantless searches were instituted at airports and in courthouses
> > because of the unprecedented wave of bombings and other acts of
> > violence which inflicted death or serious injury to a large number of
> > persons in the late 1960's and early 1970's. These terrorist efforts to
> > bomb courthouses threatened to undermine the rule of law, while the
> > attempts to blow up airplanes were often linked to aircraft hijackings.
> > As unruly as patrons at the Coliseum might have been and as great a

> show of violence as might have occurred with the throwing of a bottle at a performer and the successful attempt to prevent a policeman from making an arrest, the dangers posed by these actions are substantially less than those which justified suspending the warrant requirement in courthouse and airport searches. This does not mean that the disruption of Coliseum events is not a cause for alarm or concern, but rather to suggest that other less constitutionally questionable actions should be employed to control the behavior of those attending activities at the Coliseum.

> *Wheaton v. Hagan*, [435 F. Supp. 1134, 1145 (M.D.N.C. 1977)]. Furthermore, in contrast to the high degree of intrusion in the pat-down frisk employed by Seattle police, both airport searches which are conducted with a magnetometer and courtroom searches which employ a brief stop and a visual examination of packages, pocketbooks, and briefcases are far less intrusive. *Downing v. Kunzig*, [454 F.2d 1230, 1233 (6th Cir. 1972)]; *United States v. Edwards*, 498 F.2d 496 (2d Cir. 1974).

*Id.* at 673-74.

The greater danger addressed by courthouse security screening and the lesser intrusion it presents distinguishes it from contexts in which the Washington Supreme Court has considered, but declined to recognize, a special needs exception. In *York*, the four justices who declined to adopt the exception in the context of randomly drug testing student athletes were concerned about its possible breadth, *see* 163 Wn.2d at 314, finding "[m]ost troubling"

> that we can conceive of no way to draw a principled line permitting drug testing of only student athletes. If we were to allow random drug testing here, what prevents school districts from either later drug testing students participating in any extracurricular activities, as federal courts now allow, or testing the entire student population?

*Id.* at 315-16 (lead opinion).

24

*Olsen* and *Blomstrom* both involved urine testing, which, "[i]n the context of a state-ordered search," the court characterized as "'particularly destructive of privacy and offensive to personal dignity.'" *Blomstrom*, 189 Wn.2d at 403 (quoting *York*, 163 Wn.2d at 327 (Madsen, J., concurring)). *Olsen* did so in the context of probationers, who have a reduced expectation of privacy and thereby no need for a warrant, a warrant exception, or even probable cause; a new balancing test applicable to probationers was deemed appropriate. *Olsen*, 189 Wn.2d at 126. *Blomstrom* involved individuals charged with DUI but not yet convicted; the court held that they suffered "no diminution in their privacy interests sufficient to justify highly invasive urinalysis testing." 189 Wn.2d at 411.

In contrast, area-entry security screening at courthouses for weapons and explosives presents a relatively minor intrusion into private affairs in order to protect the safety of those who work in or depend on the justice system, and to prevent violence that would undermine the rule of law. While our Supreme Court has never analyzed the constitutionality of a courthouse security screening process under article I, section 7, it has repeatedly spoken of the courthouse security screening process as valid. The

reasoning it has applied in considering a Washington special needs exception over the years supports relying on such an exception as authority of law for the search of Mr. Griffith.[12]

Decisions of our Supreme Court suggest that a special needs exception to article I, section 7 will be narrower than the federal special needs exception in two respects. The first is that the need for an exception to the warrant requirement is a threshold requirement, *before* any balancing of interests begins. This was Justice Blackmun's stated intention in introducing the concept of a special need when he dissented in *T.L.O.* In again dissenting in *O'Connor v. Ortega*, 480 U.S. 709, 742, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987), he lamented that Fourth Amendment jurisprudence has strayed from the requirement to first find the special need. He observed that the Court "mentions the 'special need' step," but then "turns immediately to a balancing test to formulate its standard of reasonableness." *Id.* In Justice Blackmun's view,

> only when the practical realities of a particular situation suggest that a
> government official cannot obtain a warrant based upon probable cause
> without sacrificing the ultimate goals to which a search would contribute,

---

[12] We reject the trial court's reasoning that modern drugs such as fentanyl pose a sufficient danger to the public justify being the object of courthouse security screening in and of themselves. No evidence was presented that fentanyl is on the verge of being weaponized for use in attacks in places like state courthouses. And as Mr. Griffith points out, to search for the small amounts of fentanyl that can be lethal would necessarily be highly intrusive. The balancing of the governmental interest advanced and the privacy interests implicated is diametrically different from that presented by screening for traditional weapons.

> does the Court turn to a "balancing" test to formulate a standard of reasonableness for this context.

*Id.* at 741.

Justice Utter emphasized this requirement of the "special needs" exception in his concurring and dissenting opinion in *Juveniles*. 121 Wn.2d at 100 (Under the "special needs" analysis, "it is not only the special need to search that is at issue, but also the special need to search without a warrant or probable cause."). In her concurring opinion in *York*, Justice Madsen viewed it as essential under article I, section 7 that a special need be found first, stating that for a search to satisfy Washington's narrow special needs exception, "adherence to the requirement of a warrant and probable cause [must] be impracticable under the circumstances." 163 Wn.2d at 321. She distinguished Washington's exception from the federal exception, which she said "permits a balancing approach as an alternative to a warrant under a broader range of circumstances than does article I, section 7." *Id.* at 322.

A second respect in which prior cases suggest that the Washington exception will be narrower is in what is weighed in the balancing process. As the court stated in *Mesiani*, "'The easiest and most common fallacy in "balancing" is to place on one side the entire, cumulated "interest" represented by the state's policy and compare it with one individual's interest in freedom from the specific intrusion on the other side.'" 110

Wn.2d at 459 (quoting *State v. Tourtillott*, 289 Or. 845, 881, 618 P.2d 423 (1980) (Linde, J., dissenting)). "A fairer balance would weigh the actual expected alleviation of the social ill against the cumulated interests invaded." *Id.*

If Mr. Mattix's search was constitutional, Mr. Griffith offers no argument why the methamphetamine removed from his coat pocket would not be admissible at trial under the plain view exception to the warrant requirement. "The plain view doctrine is applicable where the police are justified by warrant, or by an exception to the warrant requirement, to search in a protected area for a specified object. If, in the course of that search, they happen across some item for which they had not been searching and the incriminating character of the item is immediately recognizable, that item may be seized." *State v. Hudson*, 124 Wn.2d 107, 114, 874 P.2d 160 (1994).

As with our analysis of the Fourth Amendment, a factual question remains whether Mr. Mattix's search was properly cabined. The matter must be remanded for a finding on whether Mr. Mattix felt a cellphone in Mr. Griffith's pocket before reaching into the pocket and extracting the baggie of methamphetamine.

II.     IF SUPPRESSION IS NOT GRANTED, MR. GRIFFITH IS ENTITLED TO A NEW TRIAL

Mr. Griffith argues that there is an insufficient showing that he entered a voluntary, knowing, and intelligent waiver of his right to a jury trial.

The federal and state constitutions both guarantee the right to a jury trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 21. The right may be waived, but it must be

done so voluntarily, knowingly, and intelligently. *City of Bellevue v. Acrey*, 103 Wn.2d 203, 207, 691 P.2d 957 (1984). The State has the burden to demonstrate a valid waiver. *State v. Wicke*, 91 Wn.2d 638, 645, 591 P.2d 452 (1979). If the record is insufficient to demonstrate that the waiver was valid, the court will make every reasonable presumption against validity. *Id.* Whether the waiver is valid is an issue of law that we review de novo. *State v. Ramirez-Dominguez*, 140 Wn. App. 233, 239, 165 P.3d 391 (2007). A challenge that the jury trial right was not waived is a manifest constitutional error that can be raised for the first time on appeal. RAP 2.5(a)(3); *State v. Hos*, 154 Wn. App. 238, 250, 225 P.3d 389 (2010).

The record must show that the defendant personally waived the jury trial right. *Id.* (citing *Wicke*, 91 Wn.2d at 644). A record showing that the defendant orally waived the right may be sufficient to prove a valid waiver for constitutional purposes, notwithstanding CrR 6.1's requirement of a written waiver. *Id.* A statement by defense counsel that the defendant waived the right is insufficient. *Id.*

The State points to statements made by Mr. Griffith's lawyer that fail to meet its burden of demonstrating a voluntary, knowing, and intelligent waiver by Mr. Griffith. Proof of Mr. Griffith's agreement to a stipulated facts trial is insufficient; while such a trial is ordinarily conducted to the bench, it can be tried to a jury.

If upon remand the suppression motion is again denied, Mr. Griffith is entitled to a new trial.

We vacate the trial court's suppression decision and remand for further proceedings consistent with this opinion.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Fearing, J.